15959

## MOODY v. DILLON CO.

(43 S. E. (2d) 201)

*Messrs. Bridges & Blackwell,* of Florence, for Appellant, cite:

*Messrs. Samuel Want, James S. Verner and Sam Rogol,* of Darlington, for Respondent, cite:

June 11, 1947.

OXNER, J.:

This is an action to recover damages on account of personal injuries sustained by respondent at about 4:00 P.M. on August 10, 1945, in the town of Dillon. Respondent alleged that his injuries resulted from the negligent operation of appellant's truck. At appropriate stages of the trial appellant moved for a nonsuit and a directed verdict upon the grounds (1) that there was no evidence of any actionable negligence on its part, and (2) that respondent was guilty of contributory negligence. These motions were overruled by the trial Judge and the case submitted to the jury, resulting in a verdict for respondent in the sum of $12,000.00 actual damages. The trial Judge found that the amount of the verdict was excessive and ordered a new trial unless respondent remitted on the record the sum of $4,000.00. The remission was made and judgment entered against appellant in the sum of $8,000.00. This appeal followed.

The first question to be determined is whether the Court below erred in refusing appellant's motions for a nonsuit and a directed verdict.

Respondent was employed by the Dillon Cotton Company as warehouse manager and shipping clerk. There were about one hundred bales of cotton in the warehouse at Dillon, South Carolina which this Company desired to ship over

the line of the Seaboard Air Line Railway Company, and there were about eleven bales of cotton on the platform of the Atlantic Coast Line freight depot which it desired to move into its warehouse. The Dillon Cotton Company did not have a truck available for use in moving this cotton and through respondent made arrangements with appellant Dillon Company whereby the Dillon Company agreed to rent to the Dillon Cotton Company a truck with a driver to be used in moving the cotton, for which services appellant charged 15¢ for each bale of cotton moved. (The two companies have strikingly similar names and both operate cotton warehouses at Dillon, South Carolina, but they are separate and distinct corporations and have no connection with each other.) The driver of the truck was an employee of appellant and his sole duty was to drive this truck; he had nothing whatever to do with the loading and unloading of the cotton, which was done by respondent and four Negro helpers. The manual labor of loading and unloading was done by the helpers under the supervision of respondent who selected the bales to be moved and did the necessary checking. The truck used was a 1942 Chevrolet. It had an enclosed metal cab with a rear window and a flat body about twelve feet long upon which could be loaded about ten bales of cotton.

The parties commenced this work about 9:30 A.M. on the day of the accident. The weather was clear. They first proceeded to move the cotton from the warehouse and load same in the boxcars on the siding at the freight depot of the Seaboard Air Line Railway. This required about ten trips. The driver of the truck was unfamiliar with the cotton to be moved and respondent or one of his helpers would direct him where to park and when to move. In moving this cotton it became necessary from time to time for respondent to go on the truck and check the numbers on the bales to see if they corresponded with the list of cotton to be moved. The respondent and his helpers were frequently going on and off the truck while it was parked for loading

and unloading. After the last of the cotton to be shipped was taken to the Seaboard Air Line Railway depot and the final car loaded, respondent told the driver to bring the truck to the Atlantic Coast Line depot where there were eleven bales of cotton to be moved to the warehouse for restorage. It was then approaching four o'clock in the afternoon.

These eleven bales were scattered among about thirty-five bales of cotton standing on the platform against the wall of the Atlantic Coast Line freight depot and extending for a distance of approximately one hundred feet along this platform. The platform was about five feet wide and between the cotton and the edge of the platform there was a space of about two feet which was sufficient for a person to walk on in checking the cotton. It was necessary for respondent to go through all of this cotton and pick out the eleven bales to be moved which was done by checking the numbers on the tags attached to the bales.

When respondent first arrived at the depot, he had some difficulty in identifying one particular bale of cotton and for this reason had to go to the office of his employer, a distance of about a block, to get the necessary information. As he returned to the depot and had reached the steps at end of the platform, the truck passed him and after proceeding a short distance parked about 12 or 14 inches from and parallel to the platform, which was a proper position for loading the cotton on the truck. Respondent walked up the steps to the platform and proceeded to check the cotton so as to identify the bales to be moved. In doing this he walked along the two foot space between the cotton and the edge of the platform. After he had checked the numbers on about six bales of cotton, he came to a sixty gallon oil drum about half full of water which was placed there by the railroad company for protection against fire. The diameter of this drum was wider than the two foot passage space and about a third of the drum extended over the edge of the platform, thereby obstructing the path of respondent. The truck was parked along the platform at this point, the flat body of

the truck being about four inches lower than the platform. The truck had then been parked about two or three minutes and respondent thought it would continue standing there until the cotton nearby was loaded, after which the driver would be directed to move to another place along the platform. In order to pass around the drum, respondent stepped off the platform onto the body of the truck, intending to take one or two steps forward and then get back on the platform, but when he got one foot on the truck, the driver without notice drove forward, causing respondent to lose his balance and to be thrown on the ground from the back of the truck, resulting in the injuries now complained of.

The driver of the truck and respondent had known each other for some time. It is admitted that the driver saw respondent as he passed him at the steps of the platform. The driver said that he "drove up and stopped and then started pulling up again to get real close to the platform," stating that the motor was still running. He further testified as follows:

"Q. Did you look back before you moved the truck forward? A. Yes.

"Q. Did you see anything? A. No, sir.

"Q. Why did you look back? A. To see was everything clear."

In determining whether the Court below erred in overruling appellant's motions for a nonsuit and a directed verdict, the testimony and all reasonable inferences to be drawn therefrom must be viewed in the light most favorable to respondent. "Negligence is the 'want of due care', and is generally a mixed question of law and fact. In determining if negligence is inferable, all of the surrounding conditions and circumstances must be taken into consideration, and if a reasonable inference can be drawn from all of the facts and circumstances and conditions prevailing at the time of the alleged negligence that one charged therewith did not observe ordinary care, then it becomes a ques-

tion for the jury to pass upon". *Shields v. Chevrolet Truck et al.,* 195 S. C. 437, 12 S. E. (2d) 19, 23. "It is firmly established in this jurisdiction that if the inferences properly deducible from the evidence are doubtful, or if they tend to show both parties guilty of negligence or willfulness, and there may be a fair difference of opinion as to whose act produced the injury complained of as a direct and proximate cause, then the question must be submitted to the jury." *Harrison v. Atlantic Coast Line R. Co. et al.,* 196 S. C. 259, 13 S. E. (2d) 137, 141. The determination of the question of contributory negligence "must necessarily be controlled by the facts and circumstances of the particular case. The court will not decide it as one of law if the testimony be conflicting, or if the conclusion to be drawn therefrom is doubtful and uncertain. This we have decided time and again. For under such circumstances the question clearly falls within the province of the jury". *Robison v. Atlantic Coast Line R. Co. et al.,* 179 S. C. 493, 184 S. E. 96, 99.

Did the driver owe a duty to respondent and his helpers not to move the truck without notice or warning? We think the circumstances support a reasonable inference to that effect. The truck was admittedly parked in a proper position for loading some of the cotton. Respondent thought it was standing there for that purpose. The eleven bales to be moved were scattered among thirty-five bales extending a distance of about one hundred feet along the platform. The driver could not have known just where the particular eleven bales were. After the bales located near the parked truck had been loaded, it would have been necessary for respondent or his helpers to direct the driver to the next position at which the truck would be parked for further loading of the cotton. The truck had been parked two or three minutes before respondent stepped on it. It may be reasonably inferred that the driver knew respondent was on the platform checking the cotton and that he would have to pass around this drum. It is true that at this time there was no cotton on the truck, but it was rea-

sonable to anticipate that some of it might be loaded on the truck at any moment. It was for the jury to determine whether the driver should have reasonably anticipated the presence of respondent or his helpers on or about the truck at the time he started forward. No one was in a better position to know the circumstances than the driver. He thought it was necessary to look back before starting to see that "everything was clear". If the jury concluded that the driver ought not to have started the truck without warning and without keeping a reasonable lookout to the rear, should he have observed respondent in the exercise of ordinary care in keeping such a lookout? We think this was a question of fact to be determined by the jury.

■ We are also of opinion that the question of contributory negligence was properly submitted to the jury.

Appellant says that respondent adopted an unsafe way to pass around this drum when "he could have adopted a safe way by going back to the steps and going down and walking around the obstructions". The method pursued in going around the drum required only two or three steps while the method suggested would have necessitated walking between one hundred and two hundred feet. It was for the jury to determine whether respondent was negligent in assuming that the truck was standing there for loading and would not be moved without warning or without instructions from him or his helpers. If the assumption that the truck would not be moved was a reasonable one, it could not be said that respondent was negligent as a matter of law in stepping on the truck to get around the drum. Appellant further argues that the motor of the truck was running and respondent should have heard it in the exercise of ordinary care. Assuming that the motor was running, it was a question of fact for the jury to determine whether in the exercise of ordinary care respondent should have heard it at this distance.

The driver testified that the truck was parked about three feet from the platform and that he started the truck "to get

real close to the platform". This testimony is in conflict with that of respondent who said that the truck was parked about twelve or fourteen inches from the platform and was in a proper position to be loaded. This issue of fact must be resolved in favor of respondent in passing upon the motions for nonsuit and directed verdict.

We shall not undertake to review the various decisions relied upon by appellant. After careful examination of all of them, we find that they are easily distinguishable on the facts and are not in conflict with the views herein expressed.

It appears that appellant interposed a demurrer to the complaint which was overruled by order of the resident Circuit Judge. Appellant complains that the trial Judge in passing upon the motions for a nonsuit and a directed verdict gave "undue weight and consideration to the order" overruling the demurrer. We do not know to what extent, if any, the trial judge was influenced by this order but it is immaterial in view of our conclusion that the motions for a nonsuit and a directed verdict were properly overruled.

The next exception relates to the refusal of the trial Judge to grant appellant's request that the jury be permitted to view the scene of the accident. In the order denying a motion for a new trial, the trial Judge assigned the following reasons for refusing this request: "The testimony of the witnesses clearly showed the relative height of the platform and of the truck, as well as the length of the platform, and there were photographs in evidence showing the location. Nothing would be gained by a view of the site. The accident occurred in August, 1945, and the trial was held in October, 1946. A visit by the jury to the scene would not show them the truck or its position, or the same number of cotton bales in the same position on the platform, and it may well be that during the fourteen months which had elapsed since the date of the accident there has been some change in the position of the water drums on the platform. Indeed, a view of the scene of the accident might have had a tendency to confuse rather than help the jury".

This was a matter within the discretion of the trial Judge. Section 643, Code of 1942; *McCarley v. Glenn-Lowry Mfg. Co.*, 75 S. C. 390, 56 S. E. 1; *Rodgers v. Hodge*, 83 S. C. 569, 65 S. E. 819, 18 Ann. Cas. 729; *Thornton v. Spartan Mills*, 98 S. C. 262, 82 S. E. 414. We find no abuse of discretion.

The final exception relates to the refusal of the trial ■ Judge to expressly instruct the jury that punitive damages could not be awarded. Respondent alleged in his complaint that the driver of appellant's truck acted "negligently, carelessly and recklessly" and in utter disregard of his safety. The prayer is for damages in the sum of $25,000.00, but neither actual nor punitive damages are expressly mentioned. At the conclusion of the testimony the Court inquired of counsel as to their position on the question of punitive damages. Respondent's counsel then stated that they were not asking for punitive damages. Appellant's counsel thereupon asked the Court to define punitive damages and instruct the jury that such damages could not be awarded, to which the Court replied: "Well, when I tell them to give actual damages, if any at all, that would limit them to that without mentioning punitive damages". In charging the jury the Court made no reference to the allegation of recklessness or to punitive damages. The jury was instructed that if respondent was entitled to recover, "then you would consider the question of damages, actual damages * * *. It is a money award given to compensate, to make a person whole insofar as that may be done by pecuniary award". The Court further charged the jury: "If you find that the plaintiff is entitled to recover, give him such damages as in your best judgment would compensate him for injury, if he has been injured by reason of negligence on the part of the defendant". The jury was also clearly instructed as to the various elements to be considered in determining the amount of actual damages. The verdict was for $12,000.00 actual damages which, as heretofore mentioned, was reduced by the trial Judge to $8,000.00.

We may add that the injuries sustained by the respondent were of such character as to fully justify said amount of $8,000.00.

It has been held that it is not error to refuse to instruct the jury that punitive damages cannot be awarded where the plaintiff does not claim such damages and where the instructions given limit the right of recovery to compensatory damages. *Roach v. Wright*, 195 Ala. 333, 70 So. 271; *Walkup v. Beebe*, 139 Iowa 395, 116 N. W. 321; *Yeary et al. v. Holbrook*, 171 Va. 266, 198 S. E. 441. These cases clearly sustain the practice followed by the trial Judge in the instant case.

While we know of no decision by this Court involving the precise question before us, the following cases are of interest: *Wade v. Columbia Electric, etc., Co.*, 51 S. C. 296, 29 S. E. 233, 64 Am. St. Rep. 676; *Trimmier v. Atlanta & C. A. L. Railway*, 81 S. C. 203, 62 S. E. 209; *Nelson v. Atlantic, Gulf & Pacific Co.*, 107 S. C. 1, 92 S. E. 194.

We do not think the refusal of the trial Judge to give the requested instruction constitutes reversible error. The instructions given on the measure of damages related solely to compensatory damages. The jury was limited to the consideration of the various elements of actual damages as outlined by the Court and it will be assumed that these instructions were followed in determining the amount of the verdict.

It does not follow from the foregoing conclusion that in all cases where plaintiff does not claim punitive damages, it is error for the trial Judge to define such damages and instruct the jury that they cannot be recovered. The writer is of opinion that in some instances this would constitute the better practice *in tort* actions because in this way the trial Judge may be enabled more clearly to explain to the jury the nature and purpose of compensatory damages. However, as this phase of the question is not before us, we are not to be understood as deciding it.

470

Judgment affirmed.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, J.J., concur.